No. PD-_____-15

## IN THE COURT OF CRIMINAL APPEALS OF TEXAS
### AUSTIN, TEXAS

**JUSTIN SANDERS,**
**Appellant-Petitioner,**

**v.**

**THE STATE OF TEXAS,**
**Appellee-Respondent.**

_____

## PETITION FOR DISCRETIONARY REVIEW
_____

On Petition for Discretionary Review
From the Sixth District Court of Appeals, Texarkana, Texas,
In Cause No. 06-14-00079-CR, Affirming Mr. Sanders' Conviction
In Cause No. 13F1051-102 in the 102nd Judicial District Court
Of Bowie County, Texas

_____

**CLIFTON L. "SCRAPPY" HOLMES**
**State Bar No. 09907000**

**ORAL ARGUMENT**
**REQUESTED**

**GENA A. BUNN**
**State Bar No. 00790323**

**HOLMES & MOORE, P.L.L.C.**
**P.O. Drawer 3267**
**Longview, Texas  75606**
**Phone No. (903)758-2200**
**Facsimile No. (903)758-7864**

RECEIVED IN
COURT OF CRIMINAL APPEALS

October 14, 2015

ABEL ACOSTA, CLERK

**ATTORNEYS FOR APPELLANT**

## IDENTITY OF JUDGE, PARTIES, AND COUNSEL

The parties to the suit are as follows:

Trial Judge
**The Honorable Bobby Lockhart**
102nd Judicial District Court
Bowie County, Texas

Court of Appeals Panel
**The Honorable Josh R. Morriss**, III, Chief Justice
**The Honorable Bailey C. Moseley**, Justice
**The Honorable Jack Carter, Justice**, Retired, Sitting by Assignment
Sixth Court of Appeals District of Texas
Texarkana, Texas

Defendant/Appellant/Petitioner
**Justin Sanders**

Counsel for Defendant/Appellant/Petitioner
**Rick Shumaker** – trial counsel
**William Williams**
Bowie County Public Defender's Office

**Craig Henry** – direct appeal counsel

**Gena Bunn** – discretionary review counsel

State of Texas
**Samantha J. Oglesby** – trial and appeal counsel
**Kelley Crisp** – trial counsel
Assistant Criminal District Attorneys
Bowie County District Attorney's Office

i

# **TABLE OF CONTENTS**

**PAGE NO.**

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iii

Index of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Questions Presented for Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

> **I.** Did the court of appeals err by concluding that Sanders failed to preserve error regarding the trial court's denial of two motions for mistrial because Sanders did not first seek an instruction to disregard, in apparent contravention of this Court's opinion in *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004)?

> **II.** Did the court of appeals err by holding that Sanders' purported consent to the search of his cellular telephone was sufficiently attenuated from the taint of its illegal seizure by police to constitute voluntary and knowing consent sufficient to justify the warrantless seizure?

> **III.** Did the court of appeals err by concluding that the evidence was legally sufficient to support the jury's verdict of guilty of felony murder where there was insufficient evidence to support a conclusion that Sanders knew that Officer Sprague was attempting to arrest or detain him, in apparent contravention of the opinions of other courts of appeals, *Redwine v. State*, 305 S.W.3d 360, 362 (Tex. App. – Houston [14th Dist.] 2010, pet. ref'd), and *Griego v. State*, 345 S.W.3d 742, 752 (Tex. App. – Amarillo 2011), and of this Court, *Jackson v. State*, 718 S.W.2d 724, 725 (Tex. Crim. App. 1986)?

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-20

I.    The court of appeals erred by concluding that Sanders failed to preserve error regarding the trial court's denial of two motions for mistrial because Sanders did not first seek an instruction to disregard.

II.   The court of appeals erred by holding that Sanders' purported consent to the search of his cellular telephone was sufficiently attenuated from the taint of its illegal seizure by police to constitute voluntary and knowing consent to search.

III.  The court of appeals erred by concluding that the evidence was legally sufficient to support the jury's verdict of guilty where there was insufficient evidence to support a conclusion that Sanders knew that Officer Sprague was attempting to arrest or detain him.

Prayer for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Appendix. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

iii

# INDEX OF AUTHORITIES

**A.    CASES**                                                      **PAGE NO.**

Brick v. State, 738 S.W. 2d 676, 678 (Tex. Crim. App. 1987).. . . . . . . . . . . . . . 12

Delay v. State, 443 S.W. 3d 909, 912 (Tex. Crim. App. 2014). . . . . . . . . . . . . . 16

Griego v. State, 345 S.W. 3d 742, 752 (Tex. App. - Amarillo 2011).. 4,15,17,18,19

Jackson v. State, 718 S.W. 2d 724, 725 (Tex. Crim. App. 1986).. . . . . . . 4, 15,16,20

Johnson v. State, 871 S.W. 2d 744, 750 (Tex. Crim. App. 1994). . . . . . . . . . . . 11

Miranda v. Arizona, 384 U.S. 436 (1966).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Redwine v. State, 305 S.W. 3d 360, 362 (Tex. App. - Houston [14[th] Dist.] 2010,
pet. ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15,16,18,19

Riley v. California, 134 S. Ct. 2473 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

State v. Granville, 423 S.W. 3d 399, 417 (Tex. Crim. App. 2014). . . . . . . . . . . . 9

State v. Iduarte, 268 S.W. 3d at 544, 550 (Tex. Crim. App. 2008). . . . . . . . . . . 11

Wehrenberg v. State, 16 S.W. 3d 458, 469 (Tex. Crim. App. 2013). . . . . . . . . . 11

Wong Sun v. United States, 371 U.S. 471 (1963). . . . . . . . . . . . . . . . . . . . . . . 11

Young v. State, 137 S.W. 3d 65, 70 (Tex. Crim. App. 2004).. . . . . . . . . . . 4,6,7,8,9

Rules:

Texas Code of Crim. Proc., Article 38.23.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Texas Penal Code Ann. § 38.04 (West 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Texas Rules of Appellate Procedure. Rule 66.3 . . . . . . . . . . . . . . . . . . . . . . . . 1,15
Texas Rules of Appellate Procedure, Rule 66.3 (b). . . . . . . . . . . . . . . . . . . . . . . 9
Texas Rules of Appellate Procedure, Rule 66.3 (c). . . . . . . . . . . . . . . . . . . . . . 6,15

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner requests oral argument and submits that oral argument would be particularly helpful where, as here, the case involves questions of exceptional importance. The holdings of the court below contravene opinions of this Court as well as opinions of other courts of appeals, thus justifying discretionary review by this Court under Rule 66.3 of the Texas Rules of Appellate Procedure. Oral argument would therefore aid the Court in securing and maintaining uniformity of Texas court decisions on these important and far-reaching issues. Further, oral argument would be helpful to the Court due to the factual and legal complexity of the case.

## STATEMENT OF THE CASE

Petitioner Justin Sanders was charged with felony murder based on the State's accusation that he struck Texarkana Police Officer Williams Jason Sprague with his vehicle, killing him, in the course of either assaulting Sprague or evading arrest or detention by Sprague. 1 CR[1] 29. Despite incredible and inconsistent eyewitness testimony identifying Sanders' vehicle as the one – among numerous vehicles present – that actually collided with Sprague, an absence of any significant physical evidence linking Sanders or his vehicle to the collision, and a paucity of evidence supporting a conclusion that Sanders either intentionally assaulted Sprague or knew that Sprague was attempting to arrest him, a jury found Sanders guilty of felony murder and sentenced him to 30 years' imprisonment in the Correctional Institutions Division of the Texas Department of Criminal Justice and a fine of $5,000.00. 1 CR 143-45.

---

[1] "CR" refers to the Clerk's Record of documents filed with the district clerk during the course of trial proceedings, preceded by volume number and followed by citation to page numbers. "RR" refers to the Reporter's Record of transcribed trial proceedings, preceded by volume number and followed by citation to page numbers.

## STATEMENT OF PROCEDURAL HISTORY

On August 12, 2015, the Sixth District Court of Appeals issued its opinion and entered judgment affirming the judgment of the trial. *See* Appendix. No motion for rehearing was filed. This petition is timely filed after one duly granted extension of time.

## QUESTIONS PRESENTED FOR REVIEW

I.    Did the court of appeals err by concluding that Sanders failed to preserve error regarding the trial court's denial of two motions for mistrial because Sanders did not first seek an instruction to disregard, in apparent contravention of this Court's opinion in *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004)?

II.    Did the court of appeals err by holding that Sanders' purported consent to the search of his cellular telephone was sufficiently attenuated from the taint of its illegal seizure by police to constitute voluntary and knowing consent sufficient to justify the warrantless seizure?

III.    Did the court of appeals err by concluding that the evidence was legally sufficient to support the jury's verdict of guilty of felony murder where there was insufficient evidence to support a conclusion that Sanders knew that Officer Sprague was attempting to arrest or detain him, in apparent contravention of the opinions of other courts of appeals, *Redwine v. State*, 305 S.W.3d 360, 362 (Tex. App. – Houston [14th Dist.] 2010, pet. ref'd), and *Griego v. State*, 345 S.W.3d 742, 752 (Tex. App. – Amarillo 2011), and of this Court, *Jackson v. State*, 718 S.W.2d 724, 725 (Tex. Crim. App. 1986)?

The court of appeals set forth the following brief background facts in its memorandum opinion:

> Near midnight in the summer of 2013, a 9-1-1 operator received a telephone call reporting a large disturbance at Grady T. Wallace Park (the Park) in Texarkana, Texas. The ensuing arrival of Texarkana Police Officer William Jason Sprague at the Park with the lights on his patrol car ablaze prompted a stampede of automobiles attempting to leave the Park. One of the fleeing cars struck Sprague, who later died from the injuries he sustained. Justin Sanders was accused of having driven the car that struck Sprague. . . .
>
> * * *
>
> A Texarkana city ordinance prohibits people from using the Park after 10:00 p.m. Nevertheless, reports to the 9-1-1 emergency line were made near midnight June 14, 2013, of a large disturbance at the Park. Police were dispatched, and Officer Sprague (who was dressed in his policeman's uniform and was driving a prominently marked patrol car) was the first officer to arrive, finding about 100 people in the Park. Only minutes after Sprague's arrival, another call to the 9-1-1 emergency operator was placed. This call was from an unidentified person who was at the Park, and that person reported that a police officer had been struck by a vehicle. The caller did not see the vehicle strike the officer, but thought the vehicle was a brown, four-door, Chevrolet Sport Utility Vehicle (SUV).
>
> Officer Chris Phelps, the next officer to arrive at the Park, testified that he saw numerous vehicles driving out of and away from the Park. He also saw Sprague lying unconscious on the ground with blood coming out of his ears and pieces from his uniform scattered around him. Because he believed Sprague to be struggling to breath, he cut Sprague's shirt, vest, and duty belt off. Phelps and other officers interviewed several people still at the scene, and they got several different versions of the event, but none of the interviewees admitted to having seen whose vehicle had struck Sprague. Sprague was taken to Christus St. Michael Hospital where he later died from his injuries.

Appendix at 2-3 (footnoted omitted).

## ARGUMENT

**I.     The court of appeals erred by concluding that Sanders failed to preserve error regarding the trial court's denial of two motions for mistrial because Sanders did not first seek an instruction to disregard.**

The court below erred by concluding that Sanders failed to preserve error regarding the trial court's denial of two defense motions for mistrial because Sanders did not first seek an instruction to disregard. *See* Appendix at 11-14, 30-33. This holding contravenes this Court's opinion in *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004). Therefore, pursuant to Rule 66.3(c) of the Texas Rules of Appellate Procedure, this Court should grant Sanders' petition for discretionary review.

The first defense motion for mistrial occurred when defense counsel noticed that members of the prosecution team were wearing "fallen officer" wristbands. 11 RR 21; 18 RR Record Exhibit No. 9(2). Sanders objected to the wristbands, arguing that the prosecutors' conduct violated Sanders' right to a fair trial and his right to be tried by a fair and impartial jury. The trial court instructed the prosecutors to remove the wristbands. Sanders then moved for a mistrial, which the trial court denied. 11 RR 21-24.

The second defense motion for mistrial was based on improper prosecutorial questioning. At a pretrial hearing, the State had announced that some of the State's witnesses were being threatened and that one had been assaulted. 7 RR111-112. The

6

State then went on to clarify, "We have received no information that these threats or assaults were done at the request of Mr. Sanders or his friends and family."

At trial, the State queried one of its witness, "Have you, in fact, also been threatened because people knew you were –" Sanders immediately objected. The trial court sustained the objection and removed the jury from the courtroom in order to conduct a brief hearing outside its presence. 11 RR157. Sanders requested a mistrial, arguing that because the State had conceded it had no evidence of Sanders' involvement with the alleged threats, its proposed question was "so outrageous and so inflammatory" that its taint rendered it impossible for the jury to render a fair verdict. 11 RR158. The trial court sustained Sanders' objection to the question, but denied his motion for mistrial. 11 RR161.

On Sanders' appeal of the trial court's denials of these motions for mistrial, the court of appeals, in both instances, declined to consider the merits of Sanders' claims based on its conclusion that Sanders had failed to preserve the errors for review. *See* Appendix at 14, 33. Specifically, the court below held that, because Sanders had failed to request an instruction to disregard before seeking a mistrial, he had forfeited his right to challenge the trial court's denial of his motions for mistrial. *Id.* However, these holdings are inconsistent with the holding of this Court in *Young v. State*, 137 S.W.3d at 70. In *Young*, this Court held that a defendant may preserve error for appeal by moving for a mistrial without first making an objection and requesting an

7

instruction to disregard. *Id.* at 67. The Court acknowledged that

> the traditional and preferred procedure for a party to voice its complaint has been to seek them in sequence – that is, (1) to object when it is possible, (2) to request an instruction to disregard if the prejudicial event has occurred, and (3) to move for a mistrial if a party thinks an instruction to disregard was not sufficient. However, this sequence is not essential to preserve complaints for appellate review. The essential requirement is a timely, specific request that the trial court refuses.
>
> \* \* \*
>
> Accordingly, when a party's first action is to move for mistrial . . . , the scope of appellate review is limited to the question whether the trial court erred in not taking the most serious action of ending the trial, in other words, an event that could have been prevented by timely object or cured by instruction to the jury will not lead an appellate court to reverse a judgment on an appeal by the party who did not request these lesser remedies in the trial court. Limited as this scope of appellate review may be, such an appellate review is available to such a party.

137 S.W.3d at 69 (footnotes omitted). Here, Sanders objected in both instances. However, the trial court's sustaining of those objections did not cure the prejudice resulting from the improper conduct. Further, instructions to disregard would have been utterly useless in preventing prejudice. In the first instance, an instruction to the jury to disregard the prosecutors' "fallen officer" wristbands would only have served to bring additional attention to and further identify the improper conduct and may even have brought the conduct to the attention of any jurors who had not yet observed the wristbands or been aware of their meaning. In the second instance, the State's question implying that Sanders had threatened a State's witness – particularly in light of the State's prior concession that there was no evidence Sanders or his family were

8

linked in any way to such threats – was so inflammatory and prejudicial that no instruction could have cured the error.

In light of *Young*, this Court should grant review, reverse the holdings of the court below that Sanders failed to preserve error, and remand to the court below for consideration of the claims on their merits.

## II. The court of appeals erred by holding that Sanders' purported consent to the search of his cellular telephone was sufficiently attenuated from the taint of its illegal seizure by police to constitute voluntary and knowing consent to search.

The court of appeals also erred by holding that Sanders' purported consent to the search of his cellular telephone was sufficiently attenuated from the taint of its illegal seizure by police to constitute voluntary and knowing consent to search. *See* Appendix at 26-30. This Court should grant Sanders' petition for discretionary review to address the important question of law presented in this issue. *See* Tex. Rules App. Proc., Rule 66.3(b).

"A cell phone is unlike other containers as it can receive, store, and transmit an almost unlimited amount of private information. The potential for invasion of privacy, identity theft, or, at a minimum, public embarrassment is enormous." *State v. Granville*, 423 S.W.3d 399, 417 (Tex. Crim. App. 2014). Both this Court and the United States Supreme Court have recently recognized that a person has a reasonable

expectation of privacy in a cell phone – even when that phone is in the possession of the jail property room. *Id.*; *Riley v. California*, 134 S. Ct. 2473 (2014).

Sanders filed a motion to suppress all evidence obtained from the search of his cell phone. 1 CR 99-100. At the conclusion of a pretrial hearing, the trial court denied the motion to suppress. 7 RR 63-88, 106-111. At trial, Sanders renewed his objection that the evidence was illegally obtained, and the objection was overruled by the trial court. 11 RR 213-14; 12 RR 23-24.

The trial court based its denial of Sanders' suppression motion on its finding that Sanders consented to the seizure of the cell phone by voluntarily turning the cell phone over to police during interrogation. The court below correctly held that this finding was not supported by the record in light of the fact that Sanders surrendered his cell phone only after police entered the interrogation room and demanded Sanders' cell phone. Appendix at 23-24; *see also* 7 RR 64-65, 71. Thus, Sanders merely acquiesced to law enforcement's command to hand over his cell phone. Accordingly, the State failed its burden to prove Sanders consented to the seizure of his cell phone. The court below also correctly rejected the State's alternate reliance on the seizure-incident-to-lawful-arrest exception, the inevitable discovery doctrine, and the exigent circumstances exception. Appendix at 24-26.

But despite its conclusion that the initial seizure of Sanders' cell phone by the police did not fall within any recognized exception to the warrant requirement, the

court below concluded that, after the warrantless seizure, Sanders consented to having his phone searched and that such consent was sufficiently attenuated from the taint of the prior illegal seizure to allow the admission of the evidence. Appendix at 26-27. This was error.

The "fruit of the poisonous tree" doctrine serves to exclude as evidence direct and indirect products of Fourth Amendment violations. *Wong Sun v. United States*, 371 U.S. 471 (1963); *State v. Iduarte*, 268 S.W.3d 544, 550 (Tex. Crim. App. 2008). However, evidence is not classified as a fruit that must be excluded merely because it would not have been discovered but for the violation. *Wong Sun*, 371 U.S. at 487-88; *Iduarte*, 268 S.W.3d at 550. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488.

Thus, if the evidence seized is sufficiently attenuated from the violation of the law, the evidence is not considered to be obtained in violation of the law for purpose of Article 38.23 of the Texas Code of Criminal Procedure. *Johnson v. State*, 871 S.W.2d 744, 750 (Tex. Crim. App. 1994). Evidence will not be excluded under Article 38.23 if the taint from the illegality has dissipated by the time the evidence is acquired. *Wehrenberg v. State*, 416 S.W.3d 458, 469 (Tex. Crim. App. 2013). The

11

burden is on the State to prove by clear and convincing evidence that the taint inherent in the illegal search or seizure had dissipated by the time the consent was given. *Brick v. State*, 738 S.W.2d 676, 678 (Tex. Crim. App. 1987). In that respect, an appellate court considers the following factors: (1) the temporal proximity between the unlawful seizure and the given consent; (2) whether the warrantless seizure brought about police observation of the particular object for which consent was sought; (3) whether the seizure resulted from flagrant police misconduct; (4) whether the consent was volunteered or requested; (5) whether the defendant was made fully aware of the right to refuse consent; and (6) whether the police purpose underlying the illegality was to obtain consent. *Brick*, 738 S.W. 2d at 680-81.

The court of appeals' analysis of the *Brick* factors in the instant case is flawed. *See* Appendix at 27-30. The court noted that, almost an hour after the interrogation was concluded (and Sanders was still being detained), Detective Billy Giddens entered the interrogation room and demanded that Sanders' turn over his cell phone. *Id.* at 26. About ten minutes later, Giddens came back into the interrogation room and said, "What's your password." 7 RR 65, 66. Giddens then told Sanders that he was getting a warrant and that he was not going to go through Sanders' phone until he obtained the warrant. 7 RR 65. Almost immediately after making that statement, Giddens asked Sanders if he minded if they looked through his phone. Sanders responded, "No." 7 RR 71. According to the court below, Giddens seized the phone

12

about thirty minutes before he asked Sanders for his consent to search it. Appendix at 28. The court characterizes this passage of time as *not* "soon after" and concludes that it weights "slightly" in favor of admission. *Id.* But in light of the circumstances that existed – the fact that Sanders had been subjected to police interrogation for an extended period of time, that Sanders remained in detention in the interrogation room during the entire period of time, and that Giddens' initial illegal seizure of the phone was followed in short order by additional communications with Sanders culminating in his request for consent – the temporal proximity weighs in favor of suppression.

Further, after seizing the cell phone and obtaining the pass code, Giddens "went through" the phone's text messages. Appendix at 28. Though he was not able to detect any pertinent information, he did take advantage of the opportunity occasioned by the illegal seizure to observe Sanders' cell phone and make at least a cursory attempt to search its contents. So contrary to the lower court's conclusion, this factor also weighs in favor of suppression.

Regarding the third and sixth factors, the court of appeals apparently concluded that Giddens seized the phone based on his mistaken belief that the seizure was necessary to prevent the imminent destruction of evidence by Sanders. Thus, according to the lower court, the seizure did not constitute flagrant police misconduct. Appendix at 28-29. But as the court determined in rejecting the State's exigent circumstances argument, just slightly less than an hour had passed between the time

Sanders appeared to be "busy" on his cell phone and the time Giddens entered the interrogation room and demanded Sanders' phone. *Id.* at 25-26. These facts belie the State's argument and the lower court's own conclusion regarding these factors. The evidence supports a conclusion that Giddens' conduct was very likely calculated to cause fear, surprise, or confusion, and that Giddens illegally seized Sanders' phone in order to gain consent to search it. These factors also weigh in favor of suppression.

The court of appeals agreed that Sanders did not volunteer his consent to the search. Rather, Detective Giddens requested his consent. This factor weighs in favor of suppression. Appendix at 29. Finally, there is no evidence that Giddens made Sanders aware that he could refuse consent. The lower court noted that Sanders had been advised of his *Miranda*[2] rights, including his right to terminate the interview at any time. The court reasoned that Sanders could have inferred from the *Miranda* warnings that he could also refuse consent to search. *Id.* But the opposite could just as well have been true. Having been advised specifically regarding his right to terminate the interview, Sanders could have assumed that the absence of such explicit advice regarding the search meant that he did not have a right to refuse consent. Despite the court of appeals' characterization of this as a "neutral factor," the factor weighs in favor of suppression.

Contrary to the lower court's holding, a majority of the *Brick* factors favor

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

suppression. The State failed to meet its burden to prove by clear and convincing evidence that the taint of the illegal seizure had dissipated when Sanders purportedly consented to the search. Therefore, Sanders' purported consent was not a sufficient intervening circumstance to dissipate the taint of the primary illegality. The court of appeals erred in holding otherwise. This Court should therefore grant review and reverse that holding.

**III. The court of appeals erred by concluding that the evidence was legally sufficient to support the jury's verdict of guilty where there was insufficient evidence to support a conclusion that Sanders knew that Officer Sprague was attempting to arrest or detain him.**

Finally, the court below erred by concluding that the evidence was legally sufficient to support the jury's verdict of guilty of felony murder where there was insufficient evidence to support a conclusion that Sanders knew that Officer Sprague was attempting to arrest or detain him. This holding conflicts with opinions of other courts of appeals, *Redwine v. State*, 305 S.W.3d 360, 362 (Tex. App. – Houston [14th Dist.] 2010, pet. ref'd), and *Griego v. State*, 345 S.W.3d 742, 752 (Tex. App. – Amarillo 2011), and of this Court, *Jackson v. State*, 718 S.W.2d 724, 725 (Tex. Crim. App. 1986). Therefore, pursuant to Rule 66.3(a), (c) of the Texas Rules of Appellate Procedure, this Court should grant Sanders' petition for discretionary review.

As the court below recognized, the eyewitness testimony identifying Sanders' vehicle as the one that struck Sprague was "questionable," and the physical evidence linking Sanders' vehicle to the collision was "minimal." Appendix at 40. But even assuming, in light of the deference due "the jury's institutional prerogative to resolve all contested issues of fact and credibility,"[3] that a rational jury could conclude beyond a reasonable doubt that it was Sanders' vehicle that struck Sprague, the evidence is insufficient to support a conclusion that Sanders struck Sprague while in the course of committing the felony offense of evading arrest or detention with vehicle.[4] Specifically, there was insufficient evidence from which a jury could reasonably infer, beyond a reasonable doubt, that Sanders knew Sprague was attempting to arrest him.

For a defendant to be found guilty of evading arrest or detention, "it is essential that a defendant know the peace officer is attempting to arrest him." *Jackson v. State*, 718 S.W.2d at 725. *See* Tex. Penal Code Ann. § 38.04 (West 2013) (setting forth elements of evading arrest or detention). *See also Redwine*, 305 S.W.3d at 362 (noting that a person commits the offense of evading arrest of detention only if the

---

[3] Appendix at 40 (quoting *Delay v. State*, 443 S.W.3d 909, 912 (Tex. Crim. App. 2014)).

[4] The court of appeals did not address whether the evidence was sufficient to support a possible conviction based on aggravated assault of a public servant, having found the evidence sufficient to support Sanders' conviction based upon felony evading arrest. Appendix at 41, n.16.

16

person "knows a police officer is attempting to arrest him but nevertheless refuses to yield to a police show of authority"); *Griego*, 345 S.W.3d at 752 (holding evidence was insufficient to enable jury to conclude beyond a reasonable doubt that appellant knew, prior to exiting his vehicle, that officers were attempting to arrest or detain him). The circumstances and holdings of these cases are instructive.

In *Griego*, two officers were en route to a house with their lights and sirens activated in response to a report of illegal activity when the officers met the defendant traveling the opposition direction in a vehicle matching the suspect's car. 345 S.W.3d at 745. The officers and appellant met at a bend in the road, and the officers turned around after the bend. *Id.* The officers were not sure whether appellant saw them turn around. *Id.* at 747. After the officers turned around, appellant's vehicle was some distance ahead of them, and appellant had turned onto another road. *Id.* By the time the officers caught up with the defendant, he was signaling another turn. *Id.* The officers had followed the defendant only one-half to one block, approximately 17 seconds, by the time the defendant pulled into a residential driveway.[5] *Id.* at 747-48. As the officers pulled up to the residence, the defendant got out of the car, with a beer in hand, and walked toward the residence, at which time the officers ordered

---

[5] The *Griego* court also noted that, though there was evidence that police had activated their lights and sirens and that the appellant had seen them, the officers were traveling in the opposite direction from appellant when appellant would have been able to take notice of the lights and sirens; thus, he could not have known from the encounter that the officers were attempting to arrest or detain him.

him to stop. *Id.* at 747. When the defendant did not comply, an officer used a taser on him. *Id.*

The *Griego* court concluded that the evidence was not sufficient to show the defendant knew, before getting out of his car, that the officers were attempting to arrest or detain him because the defendant met the officers traveling in the opposite direction with their lights and sirens activated and the video of the pursuit showed that, of the 17 seconds that officers followed the defendant, the officers would have been visible in the defendant's rearview mirror for only eight seconds. *Id.* at 752-53. However, the court concluded that appellant knew or should have known that officers were trying to detain or arrest him after the officers ordered him to stop. *Id.* at 755. Thus, the evidence was not sufficient to show the defendant committed the felony offense of evading arrest or detention using a vehicle, but was sufficient to support the conclusion that the defendant committed the misdemeanor offense of evading arrest or detention. *Id.* at 754-55.

Similarly, in *Redwine*, the defendant was driving on a rural road when he encountered a patrol car driving in the opposite direction. 305 S.W.3d at 361. The officers in the patrol car decided to turn around and pursue the defendant for driving too near the center of the road. But the officers never activated their emergency lights and siren. *Id.* The officers followed the defendant's vehicle onto a dirt driveway where they found the vehicle unoccupied. *Id.* at 362. They exited the patrol car and

18

shouted, "Sheriff." *Id.* The defendant eventually returned on foot to his vehicle where he was arrested. *Id.* The defendant was convicted of evading arrest using a vehicle, and the court concluded the evidence was legally insufficient to support the conviction because there was no evidence that appellant evaded arrest while he was in his vehicle. *Id.* at 362, 368. The court also noted that Redwine's statement that he was trying to avoid contact with the police was not evidence that he was trying to evade arrest.

Likewise, in the instant case, there is no evidence that Sanders knew that Sprague was trying to arrest him. There were numerous vehicles present at the Park when Sprague arrived. Indeed, numerous vehicles were attempting to leave the Park at the same time. The audio recording from Sprague's patrol car reveals that Sprague yelled, "Hey, stop." But as the lower court determined, "[i]t is impossible to determine from the recording the identity of the person to whom Sprague's comment was directed." Appendix at 36. The fact that Sprague's lights and sirens were activated, even if Sanders saw the lights and heard the sirens, does not prove that Sanders knew Sprague was trying to arrest *him*. *Griego*, 345 S.W.3d at 747-48. And even if the evidence showed that Sanders was trying to avoid contact with Sprague, as apparently many of those present at the Park that night appeared to be, such would not constitute evidence that he was trying to evade arrest. *Redwine*, 305 S.W.3d at 362. "The gravamen of the offense is the evasion of an arrest, not the evasion of a

police officer." *Jackson v. State*, 718 S.W.2d at 726 (citation omitted).

Even viewing the facts of this case in the light most favorable to the jury's verdict, there was insufficient evidence from which a jury could reasonably infer, beyond a reasonable doubt, that Sanders knew Sprague was attempting to arrest him, an essential element of the underlying offense evading arrest or detention. Therefore, this Court should grant petition for discretionary review, reverse the judgment of the court of appeals, and render judgment of acquittal.

## **PRAYER FOR RELIEF**

For all of the above and foregoing reasons, Petitioner Sanders respectfully requests that the Court grant discretionary review, conduct oral argument, and reverse the judgment of the court of appeals, and grant any other relief, whether at law or in equity, to which Petitioner has shown himself justly entitled.

Respectfully submitted,

*/s/ Gena Bunn*

_____
CLIFTON L. "SCRAPPY" HOLMES
State Bar No. 09907000
DAVID E. MOORE
State Bar No. 14325100
GREGORY A. WALDRON
State Bar No.  00788598
GENA A. BUNN
State Bar No. 00790323
JASON PARRISH
State Bar No. 24041653
**HOLMES & MOORE, P.L.L.C.**
P.O. Drawer 3267
Longview, Texas   75606
Phone No. (903)758-2200
Facsimile No. (903)758-7864
Email:   gbunn@holmesmoore.com

ATTORNEYS  FOR APPELLANT

21

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been delivered by United States Mail to Jerry D. Rochelle, Criminal District Attorney, Bowie County, Texas, 601 Main Street, Texarkana, Texas 75501 and to Lisa C. McMinn, State Prosecuting Attorney, P.O. Box 13046, Austin, Texas 78711-3046, on this the 12th day of October, 2015.

*/s/ Gena Bunn*

_____

Gena Bunn
Counsel for Appellant-Petitioner



# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00079-CR

_____

JUSTIN SANDERS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 13F1051-102

Before Morriss, C.J., Moseley and Carter,* JJ.
Memorandum Opinion by Justice Moseley

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

MEMORANDUM OPINION

Near midnight in the summer of 2013, a 9-1-1 operator received a telephone call reporting a large disturbance at Grady T. Wallace Park (the Park) in Texarkana, Texas. The ensuing arrival of Texarkana Police Officer William Jason Sprague at the Park with the lights on his patrol car ablaze prompted a stampede of automobiles attempting to leave the Park. One of the fleeing cars struck Sprague, who later died from the injuries he sustained. Justin Sanders was accused of having driven the car that struck Sprague and was convicted of felony murder, receiving a sentence of thirty years' imprisonment and a fine of $5,000.00.

On appeal, Sanders contends that the trial court erred (1) by denying his motion to quash the indictment, (2) by submitting a jury charge that was fundamentally defective, (3) in admitting extraneous-offense evidence, (4) overruling his motion to suppress evidence obtained from his cell phone, (5) in denying his motion for mistrial when the State engaged in prosecutorial misconduct in raising before the jury a claim that threats had been directed at witnesses, and (6) in denying his motion for mistrial for prosecutorial misconduct in the wearing by prosecuting attorneys of "fallen officer" wristbands during a part of the trial. Finally, Sanders maintains that the evidence against him is not sufficient to support the verdict.[1]

I.      Brief Background Facts

A Texarkana city ordinance prohibits people from using the Park after 10:00 p.m. Nevertheless, reports to the 9-1-1 emergency line were made near midnight June 14, 2013, of a

---

[1]In his brief, Sanders also argued that the trial court erred by revoking his bond in the jury's presence after he had been convicted of the offense but before the penalty phase had begun. However, Sanders specifically announced during oral argument that he abandoned this point of error.

large disturbance at the Park. Police were dispatched, and Officer Sprague (who was dressed in his policeman's uniform and was driving a prominently marked patrol car) was the first officer to arrive, finding about 100 people in the Park. Only minutes after Spragues' arrival, another call to the 9-1-1 emergency operator was placed. This call was from an unidentified person who was at the Park, and that person reported that a police officer had been struck by a vehicle. The caller did not see the vehicle strike the officer, but thought the vehicle was a brown, four-door, Chevrolet Sport Utility Vehicle (SUV).[2]

Officer Chris Phelps, the next officer to arrive at the Park, testified that he saw numerous vehicles driving out of and away from the Park. He also saw Sprague lying unconscious on the ground with blood coming out of his ears and pieces from his uniform scattered around him. Because he believed Sprague to be struggling to breath, he cut Sprague's shirt, vest, and duty belt off. Phelps and other officers interviewed several people still at the scene, and they got several different versions of the event, but none of the interviewees admitted to having seen whose vehicle had struck Sprague. Sprague was taken to Christus St. Michael Hospital where he later died from his injuries.

A. **Did the Trial Court Err by Denying Sanders' Motion to Quash the Indictment?**

The indictment alleged that Sanders caused Sprague's death by striking him with a motor vehicle while committing or attempting to commit "a felony offense, to-wit: Evading Arrest or Detention." On March 17, about a week before the commencement of voir dire, the State made

---

[2]We note that Chevrolets and GMCs are both manufactured by General Motors Corporation and that Chevrolet and GMC SUVs are very similar in appearance.

3

an attempt to amend the indictment by adding the language "with a vehicle" after the word "detention," but Sanders refused to agree to the amendment.[3]  Rather, Sanders filed a motion to quash the indictment.  During a hearing on his motion, Sanders argued that the indictment failed to provide notice of how the State intended to prove evading was a felony.  The trial court denied Sanders' motion.

In his first point of error on appeal, Sanders contends that the trial court erred by denying his motion to quash the indictment because the indictment failed to allege an offense—that is, that the indictment was insufficient to identify, with enough clarity and specificity, the penal statute under which the State intended to prosecute—thereby depriving the trial court of subject-matter jurisdiction.

A trial court's decision to grant or deny a motion to quash an indictment is reviewed de novo.  *State v. Barbernell*, 257 S.W.3d 248, 251–52 (Tex. Crim. App. 2008); *Tollett v. State*, 219 S.W.3d 593, 596 (Tex. App.—Texarkana 2007, pet. ref'd).  An instrument which is not an indictment under Article V, Section 12 of the Texas Constitution fails to vest the trial court with jurisdiction; the issue of whether an instrument suffices as an indictment under the Texas Constitution is a jurisdictional one that may be first raised on appeal.  *See Duron v. State*, 956 S.W.2d 547, 551 n.3, 555 (Tex. Crim. App. 1997) (Womack, J., concurring); *Cook v. State*, 902 S.W.2d 471, 479–80 (Tex. Crim. App. 1995).  "[T]o comprise an indictment within the definition provided by the constitution, an instrument must charge:  (1) a person; (2) with the commission of

---

[3]Evading arrest or detention is a class A misdemeanor unless it is committed during the commission of certain other acts.  TEX. PENAL CODE ANN. § 38.04(b) (West Supp. 2014).  One of the acts that elevates the crime from a class A misdemeanor to the level of a felony of the third degree is the use of a vehicle while the actor is in flight during the commission of the evading arrest or detention.  TEX. PENAL CODE ANN. § 38.04(b)(2)(A).

an offense." *Cook*, 902 S.W.2d at 477. "[A] written instrument is an indictment or information under the Constitution if it accuses someone of a crime with enough clarity and specificity to identify the penal statute under which the State intends to prosecute, even if the indictment is otherwise defective." *Duron*, 956 S.W.2d at 550–51.

> Here, the indictment specifically alleges that Sanders:

> did then and there intentionally or knowingly commit or attempt to commit a felony offense, to-wit: Aggravated Assault of a Public Servant, and while in the course of and in furtherance of the commission or attempt of said offense did then and there commit or attempt to commit an act clearly dangerous to human life, namely, striking Officer William Jason Sprague with a motor vehicle, which caused the death of Officer William Jason Sprague.

> **Paragraph Two**:  and it is further presented in and to said Court that the said Justin Miles Sanders heretofore on or about June 14, 2013, did then and there, intentionally commit or attempt to commit a felony offense, to-wit: Evading Arrest or Detention, and while in the course of and in furtherance of the commission or attempt of said offense did then and there commit or attempt to commit an act clearly dangerous to human life, namely, striking Officer William Jason Sprague with a motor vehicle, which caused the death of Officer William Jason Sprague.

As mentioned previously, evading arrest or detention under Section 38.04 of the Texas Penal Code is a class A misdemeanor unless the circumstances of the offense meet certain requirements under Section 38.04(b). Sanders contends that as he is ostensibly charged with felony murder under Section 19.02(b)(3),[4] paragraph two of the indictment is fundamentally flawed and fails to state an offense because it fails to allege facts sufficient to identify which subsection of 38.04(b) upon which the State relies to elevate the predicate offense to a felony.

---

[4]Section 19.02(b)(3) of the Texas Penal Code defines this offense, in pertinent part, as occurring when the actor "[C]ommits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt . . . he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2011).

5

Interestingly, Sanders chooses to excise a portion of a sentence from the indictment ("intentionally commit or attempt to commit a felony offense, to-wit: Evading Arrest or Detention") without looking at the rest of the indictment. Following that, one can see where he gleans the belief that the indictment fails to show that the evading arrest portion is a felony. However, the balance of the indictment includes the charge that Sanders was guilty of "striking Officer William Jason Sprague with a motor vehicle, which caused the death of Officer William Jason Sprague." If Sprague was struck with a motor vehicle, surely Sanders would not believe that the State had alleged that Sanders had hefted an automobile in the air and struck Sprague with it. Following Sanders' reasoning would require the reader to render the entire indictment nonsensical. Conversely, read in its entirety, the indictment clearly makes sense and clearly describes the offense with which Sanders was charged.

The State, however, is not required to allege the constituent elements of the underlying felony in an indictment for felony murder under Section 19.02(b)(3) of the Texas Penal Code, even if the accused files a motion to quash. *See Barnes v. State*, 876 S.W.2d 316, 323 (Tex. Crim. App. 1994); *Hammett v. State*, 578 S.W.2d 699, 707–08 (Tex. Crim. App. 1979). "Under the . . . Penal Code, an indictment charging one offense during the commission of another crime need not allege the elements of the latter offense," *Hammett*, 578 S.W.2d at 708, and the failure to allege an element of an offense no longer renders the indictment fundamentally defective. *See Studer v. State*, 799 S.W.2d 263, 272 (Tex. Crim. App. 1990). We find that the indictment alleged an offense sufficient to vest the trial court with jurisdiction and, therefore, the trial court properly overruled Sanders motion to quash.

6

There was a time in Texas jurisprudence that it was required that "an indictment should be so certain and definite in charging the offense that it leaves nothing to be supplied by intendment or inference." *Northern v. State*, 203 S.W.2d 206 (Tex. Crim. App. 1947).  This requirement was carried to the extreme and then abandoned.  *Vaughn v. State*, 607 S.W.2d 914, 916 (Tex. Crim. App. 1980).  When one looks at the entire indictment (and not the sole phrase emphasized by Sanders), it is plain to see that it was alleged that Sanders used "a vehicle while the actor [was] in flight" during the commission of the act of evading arrest or detention.  TEX. PENAL CODE ANN. § 38.04(b)(2)(A).

We overrule this point of error.

## II.    Did the Jury Charge Allow the Jury to Convict Sanders for an Unindicted Offense?

In his second point of error, Sanders contends that the jury charge was fundamentally defective because it omitted the factual allegations necessary to elevate evading arrest or detention to a felony and that, therefore, the charge authorized the jury to convict him for an offense not alleged in the indictment.

The pertinent portion of the charge reads:

> If you find from the evidence beyond a reasonable doubt that on or about June 14, 2013, the defendant did then and there intentionally commit or attempt to commit a felony offense, to-wit:  Evading Arrest or Detention, and while in the course of or in furtherance of the commission or attempt of said offense did then and there commit an act clearly dangerous to human life, namely, striking Officer William Jason Sprague with a motor vehicle, which caused the death of Officer William Jason Sprague you will find the defendant guilty of Felony Murder as charged in the indictment.

7

Sanders lodged no objection to this part of the jury charge. Therefore, if the jury charge was made in error, reversal is not required unless the error was so egregious and created such harm that Sanders was denied a fair trial. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984), *overruled on other grounds by Rodriguez v. State*, 758 S.W.2d 787 (Tex. Crim. App. 1988). In looking at this complaint, we must first determine whether the jury charge was erroneous. *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996), *overruled on other grounds by Gelinas v. State*, 398 S.W.3d 703 (Tex. Crim. App. 2013). If there was error in it, we must then determine whether the error in the charge resulted in egregious harm to Sanders. *Hutch*, 922 S.W.2d at 170–71.

Although we do not find the jury charge as submitted to be a paragon for all to follow, we also determine that its submission was not error. The indictment alleges that Sanders, in the course of felony evading arrest or detention, struck Sprague with a motor vehicle. Although the instruction could be read in such a way that Sanders somehow struck Sprague with a motor vehicle but not while he was driving it, logic says that would be impossible. As mentioned above, the only realistic way Sanders could have struck the officer with a vehicle is for Sanders to have been driving the vehicle. That, coupled with his action of doing so while evading arrest or detention, is the offense with which Sanders has been charged.

Even if the charge was defective, any such error is harmless because the record fails to establish that Sanders suffered egregious harm as a result. In examining the record for egregious harm, we consider the entire jury charge, the state of the evidence, the final arguments of the parties, and any other relevant information revealed by the record of the trial as a whole. *Olivas*

8

*v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006). "Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007).

### A.     The Entire Jury Charge

The abstract portion of the jury charge correctly set forth the charged and available offenses and their elements. The charge also included the statutory definitions of "public servant," "felony," "serious bodily injury," and "deadly weapon." It explained the offenses of felony murder, assault, aggravated assault, criminally negligent homicide, and evading arrest or detention. The charge also succinctly stated the applicable circumstances under which evading arrest or detention morphs from a misdemeanor to a felony offense:

> The offense of Evading Arrest or Detention is a felony if the actor uses a vehicle while in flight or another person suffers serious bodily injury as a direct result of an attempt by the officer from whom the actor is fleeing to apprehend the actor while the actor is in flight.

Thus, if there were error in the jury charge, that error lay only in the omission of a single phrase, "in a motor vehicle," immediately after "Evading Arrest or Detention" in the application paragraph. The abstract portion of the jury instruction correctly and completely set forth the charged offense, the statutory elements, and the relevant definitions.

### B.     The State of the Evidence

The evidence established that Sprague responded to a 9-1-1 call regarding an after-hours disturbance at a public park in Texarkana. Sprague parked his patrol car next to a curb and got out of the car as the cars at the Park were trying to leave. Sanders was at the Park that night, driving a silver GMC Acadia. The audio recording reveals that Sprague yelled "Stop" (supposedly at the

9

driver of the vehicle that struck him). Witness testimony said that while leaving the Park, the silver Acadia jumped a curb and struck Sprague, with one witness testifying that it ran over Sprague. The medical evidence established that Sprague died of his injuries, those fatal injuries being consistent with being struck or run over by a vehicle.

## C. The Parties' Arguments

The State argued, as stated in the indictment, that Sanders struck the officer with his SUV, either in an attempt to commit aggravated assault on a public servant, or while Sanders was trying to evade arrest or detention. Sanders neither testified nor called any witness on his behalf. Rather, his defense consisted of illuminating and concentrating on the many inconsistencies in the State's witnesses' testimony, attacking the credibility of the State's witnesses, questioning the witnesses' motives for testifying, and referring to deficiencies in the investigation. Sanders also argued in closing that the State changed its theory of the case and had attempted to mislead the jury by mischaracterizing and or exaggerating the evidence. Sanders argued that there was no evidence of his motive to evade the police that night and that there was "no credible evidence" indicating either that Sprague was trying to detain Sanders or that Sanders either knew or should have known that Sprague was trying to detain or arrest him.

In support of his argument, Sanders cites *Trejo v. State*, 313 S.W.3d 870, 873 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd), where the defendant was charged with aggravated sexual assault. In that case, Trejo argued that the trial court erred in its submission of a charge of aggravated assault as a lesser-included offense of aggravated sexual assault. *Id.* at 871. Because aggravated assault was not a lesser-included offense of aggravated sexual assault, the court of

10

appeals held not only that the trial court erred in submitting the charge to the jury, but also found that Trejo suffered egregious harm because the jury was allowed to convict the defendant based on an uncharged offense. *Id.* at 872, 874. *Trejo* is not on point. Here, the language of the indictment faithfully tracks the language of the charge's application paragraph, and further, Sanders is not arguing that the trial court erroneously submitted a lesser-included offense to the jury. The facts of this case are distinguishable from those of *Trejo*.

Even if, arguendo, there was an error in the jury charge, the record does not reflect that Sanders suffered egregious harm as a result. Accordingly, we overrule this point of error.

### III. Did the State Violate Sanders' Right to a Fair Trial by Wearing "Fallen Officer" Wristbands During Trial?

In his third point of error, Sanders contends that the State violated his right to a fair trial by wearing "fallen officer" wrist bands. The wristbands were black and blue and said, "Jason Sprague E.O.W. 6-15-13."[5]

On the fourth day of the trial, Sanders' counsel noticed that both of the attorneys for the State were wearing the black and blue "fallen officer" wristbands described above. At the bench, Sanders argued that the wristbands were "highly improper and prejudicial." After the jury was excused, the following colloquy occurred:

> [THE STATE, KELLEY CRISP]: Judge, prior to trial, Mrs. Sprague gave Samantha and I these tiny little bands that have been on our arms since Sunday. It's Thursday. Nobody has seen anything, and I've been sitting right there, and Sam has been sitting right there by him. Obviously, nobody has seen it.
>
> [THE STATE, SAMANTHA OGLESBY]: Your Honor, for the record, they are black and dark blue. They have black writing. There is no way that any

---

[5]E.O.W. means "End of Watch," and "6-15-13" was the date of Sprague's death.

11

of those jurors can read what is on our bands. It is just a plastic band on our arm, no more, no less.

THE COURT: [Defense Counsel], let me hear from you.

[Defense Counsel]: Your Honor, that'd be [defense counsel] wearing shirts that said innocent or anything. This is highly improper. They're wearing propaganda pieces that are the same as the fallen officer marking. I'm not worried about the words. It's the blue and black that's everywhere. There's stickers on cars with it. I mean, today was the first time I saw it, and I haven't been looking. You know I've been quite busy over here, but if they've been wearing this the whole trial, that's highly improper and prejudicial.

THE COURT: [Defense Counsel], I've been sitting up here the whole time, and I'll be quite honest with you, I've watched I know Samantha and Kelley both pull rubber bands off their wrist to put around photographs back and forth, and I'll be quite honest with you, I hadn't -- I thought they were rubber bands. And you can't tell what they are. You can't see any of the writing. I mean, they've been right here two feet in front of me numerous times since Sunday and Monday. I didn't notice them. I tell you what, ladies, --

[THE STATE, KELLEY CRISP]: I took it off.

THE COURT: -- out of an overabundance of caution, just take them off while we're in the courtroom. If the officer has one on, he can slip his off and just put it in his pocket right there. So, [Defense Counsel], you weren't accusing the witness of having one?

[Defense Counsel]: No, the district attorney's office. So that objection was sustained, Your Honor?

THE COURT: I understand. As the defense, you have to watch everything. But I'm just telling you, I've been sitting here for four days now, and they look like rubber bands to me. I still think they look like rubber bands. You can't tell anything that's on them, but, again, out of an overabundance of caution, if that's a motion, I'll grant it for you. If it's just a request, you know --

[Defense Counsel]: It is an objection and a motion, and then our follow-up would be we would request a mistrial on that, as well, which if I can get a ruling on the mistrial.

THE COURT: Your objection?

12

[Defense Counsel]: No. My understanding is you sustained the objection, but as far as to the mistrial?

THE COURT: It's denied.[6]

On appeal, Sanders has raised this point as a claim for denial of due process. Assuming, arguendo, that Sanders' objection raised such a due process complaint, even constitutional due process claims must be preserved for appeal by timely objection or motion. TEX. R. APP. P. 33.1(a); *Shipp v. State*, 292 S.W.3d 251, 261 (Tex. App.—Texarkana 2009, no pet.). Three steps are necessary to preserve error regarding either prosecutorial misconduct or other improper evidence or remarks placed before the jury: (1) a specific and timely objection, (2) a request for an instruction to disregard if the objection is sustained, and, (3) if the requested instruction is given, a motion for mistrial. *See Fuller v. State*, 827 S.W.2d 919, 926 (Tex. Crim. App. 1992); *see Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995), *abrogated on other grounds by Wall v. State*, 184 S.W.3d 730 (Tex. Crim. App. 2006). To preserve error, counsel must obtain an adverse ruling at one of those steps required for preservation: the objection, the request that the jury be instructed to disregard, or the motion for mistrial. *Fuller*, 827 S.W.2d at 926. The sequence of those steps is not so critical as is the fact that the movant persisted in seeking all available relief from the trial court, until the trial court effectively denies relief to which the movant is entitled. *Id.*; *see Coe v. State*, 683 S.W.2d 431, 436 (Tex. Crim. App. 1984) (counsel preserved error for not granting mistrial when overruled motion for mistrial was followed by request for instruction to disregard). Unless a complained-of event is so highly inflammatory that an instruction to

---

[6]Though the record does not specify, it appears that both of the prosecuting attorneys removed their wristbands.

13

disregard could plainly not cure its prejudicial effect, the failure to seek the instruction waives the error. *McGinn v. State*, 961 S.W.2d 161, 165 (Tex. Crim. App. 1998) (requesting an instruction to disregard required for preservation unless error is incurable); s*ee Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992); *Sawyers v. State*, 724 S.W.2d 24, 38 (Tex. Crim. App. 1986) (en banc), *overruled on other grounds by Watson v. State*, 762 S.W.2d 591 (Tex. Crim. App. 1988).

Here, while his objection was apparently sustained and the wristbands were removed, Sanders failed to ask the court to instruct the jury to disregard the wristbands. An instruction to disregard is presumed to cure the harm from almost any improper question, remark, or argument. *See Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *see Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). It is presumed that the jury will follow a court's instruction to disregard a comment. *Wesbrook*, 29 S.W.3d at 116. It is apparent from the record that the wristbands were rather inconspicuous in nature as State's counsel had been wearing the wristbands for the previous three days of trial and voir dire before Sanders finally noticed them and objected. By its own admission, the trial court failed to notice them until Sanders pointed them out.[7] Based on the record, we find that an instruction to disregard the wristbands would have been sufficient to cure any harm or prejudice they caused. Accordingly, Sanders' failure to request an instruction caused a failure to preserve this issue for our review.

---

[7]The State's counsel wore the wristband during oral argument and attempted to demonstrate to this Court whether it was noticeable. It is axiomatic that in making our decision, we can only consider the evidence in the record before us. *See Parker v. State*, 545 S.W.2d 151, 155 n.6 (Tex. Crim. App. 1977) (appellate court may only consider record presented); *Stevenson v. State*, 456 S.W.2d 60, 62 (Tex. Crim. App. 1970) (appellate court will only consider evidence in appellate record). Accordingly, we give no weight or consideration to the State's improper attempt to present and interject new, demonstrative evidence regarding the wristbands.

## IV.     Did the Trial Court Err in Admitting Extraneous-Offense Evidence?

During its case-in-chief, the State introduced text messages, forensically recovered from Sanders' cell phone, that indicated Sanders possessed and sold marihuana on the day in question (albeit ten to twelve hours before the events at issue).  In his fourth point of error, Sanders contends that the trial court erred in admitting the texts because they are evidence of extraneous offenses.

The trial court admitted the following text messages[8] over Sanders' objections:

6/13/13 1:03 p.m. From "Taylor":  lol pretty much bout to go run at Grady t now
6/13/13 1:04 p.m. From Sanders to Taylor:  Imma come see you
6/13/13 1:35 p.m. From Sanders to Taylor:  It start at 2
6/13/13 1:35 p.m. From Taylor to Sanders:  Ok well I'm at the park now
6/13/13 1:52 p.m. From Sanders to Taylor:  Lmao, I'll have you a lil something! & I've never seen you buzzed
6/13/13 1:55 p.m. From Sanders to Taylor:  You gone smoke?
6/13/13 1:58 p.m. From Sanders to Taylor:  Oh okay, cause I sho wanna get you high as shit!
6/13/13 6:01 p.m. From Rollins to Sanders:  What time and where do you want me to meet you?  Is a half 30$?
6/13/13 6:02 p.m. From Sanders to Rollins:  That's Reggie, I got some GOOD stuff in.  I can get you 2G's for 30
6/13/13 6:09 p.m. From Sanders to Rollins:  Okay, I'm at work . . . I get off at 9
6/13/13 6:12 p.m. From Rollins to Sanders:  Dang I was wanting to burn one now but that's cool just text me when you get off
6/13/13 6:22 p.m. From Sanders to Rollins:  You can come up here to my job if you want
6/13/13 6:27 p.m. From Sanders to Rollins:  I got it up here
6/13/13 6:27 p.m. From Rollins to Sanders:  Where do you work at?
6/13/13 6:28 p.m. From Sanders to Rollins:  At the liquor store by Arkansas side Tamollys
6/13/13 9:44 p.m. From Unknown to Sanders:  Come to Grady t
6/13/13 9:46 p.m. From Sanders to Unknown:  Ight

---

[8]This exchange is repeated here verbatim without notation for correct English.

The admission of extraneous-offense evidence is reviewed under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the trial court properly admits the evidence in light of the factors enunciated in *Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990), and the court's decision to admit the evidence is within the zone of reasonable disagreement, the trial court's decision will be upheld. *Moses*, 105 S.W.3d at 627.

The question of evidentiary admissibility rests on the bedrock notion of relevancy. Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. "All relevant evidence is admissible, except as otherwise provided by . . . these rules. . . . Evidence which is not relevant is inadmissible." TEX. R. EVID. 402.

### A.    Rule 404(b)

The relevancy issue sometimes appears to run afoul of Rule 404, which provides, "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b). Here, some of the text messages that were introduced clearly constitute evidence of other crimes or bad acts. If they were offered for the purpose of showing Sanders' character or his actions in conformity with that character, they would be inadmissable. *See id.* However, evidence of "other crimes, wrongs or acts" may be admissible if that evidence has relevance apart from its tendency "to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b). "Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against

16

admitting evidence of extraneous offenses including 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Daggett v. State*, 187 S.W.3d 444, 451 n.13 (Tex. Crim. App. 2005) (quoting TEX. R. EVID. 404(b)). Here, the State contends that the text messages were admissible to prove Sanders' intentions and his motive to "evade detention (and certain arrest) and/or run over the officer to avoid the confrontation" on the night in question.[9]

Although the existence of a motive is not essential to a conviction, the presence or absence of a motive for a crime is a factor related to the question of a defendant's guilt or innocence; therefore, proof of any existing motive for the offense is generally admissible. *Knox v. State*, 934 S.W.2d 678, 682 (Tex. Crim. App. 1996). Rule 404(b) permits admission of evidence of extraneous offenses to show the existence of a motive to assault an officer and evade arrest or detention. *Powell v. State*, 189 S.W.3d 285, 287–89 (Tex. Crim. App. 2006) (evidence of defendant's parole admissible under Rule 404(b) to show motive to evade detention and admission did not violate Rule 403); *DeLeon v. State*, 937 S.W.2d 129, 135–36 (Tex. App.—Waco 1996, pet. ref'd) (appellant's prior theft of automobile admissible as it created inference that his motive for beating police officer at subsequent traffic stop was to escape); *Peterson v. State*, 836 S.W.2d 760, 762 (Tex. App.—El Paso 1992, pet. ref'd) (evidence that defendant possessed marihuana, a pistol, and ammunition admissible to show motive for assaulting officer and attempting to flee).

---

[9]In its brief, the State argued that the text messages were properly admitted to prove "identity, intent, motive and Appellant's state of mind at the time of the offense." However, at trial, the State argued only intent and motive.

Here, although the text messages were exchanged some six to ten hours earlier in the day that Sprague was killed, the text messages indicated that Sanders was selling marihuana, that he would get people high, that he had the marihuana with him at work, that he got off work at 9:00 p.m., and that as of 9:46 p.m., he intended to go to the Park. Sprague arrived at the Park at about 12:30 a.m. and was struck and killed shortly thereafter. Having, selling, or distributing marihuana at the Park when Sprague arrived provided Sanders with a logical motivation to assault the officer and/or evade arrest or detention. *See id.*; *see Knox*, 934 S.W.2d at 682–83.

It is not outside the zone of reasonable disagreement to find that the evidence was admissible for the legitimate purposes stated by the trial court. The court properly provided an instruction to the jury limiting the jury's consideration of the evidence to legitimate grounds. Therefore, we find that the trial court was within its discretion to overrule Sanders' Rule 404(b) objection regarding the extraneous-offense evidence.

## B.     Rule 403

At trial, Sanders argued that even if the text messages were admissible under Rule 404, they were inadmissible under Rule 403 because their probative value was substantially outweighed by their prejudicial effect. TEX. R. EVID. 403, 404. After a hearing and lengthy arguments, the trial court found the evidence admissible under Rules 403 and 404. On appeal, Sanders contends that the trial court erred in finding that their admission into evidence did not violate Rule 403 of the Texas Rules of Evidence.

If the trial court determines the evidence is relevant beyond character conformity, further objection based on Rule 403 imposes a duty on the court to balance the probative value of the

18

evidence against the danger of unfair prejudice and to admit the evidence unless its probative value is substantially outweighed by the danger of unfair prejudice. *Montgomery*, 810 S.W.2d at 387. Our analysis is guided by the following factors, known as the *Montgomery* factors: (1) how compellingly the extraneous-offense evidence serves to make a fact of consequence more or less probable; (2) the potential the other-offense evidence has to impress the jury "in some irrational but nevertheless indelible way"; (3) the time the proponent needed to use in developing the evidence (during which, the jury will be distracted from consideration of the indicted offense); and (4) the force of the proponent's need for this evidence to prove a fact of consequence (that is, does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute?). *Montgomery*, 810 S.W.2d at 389–90; *see Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002); *Hartsfield v. State*, 305 S.W.3d 859, 873 (Tex. App.— Texarkana 2010, pet. ref'd).

We review a trial court's Rule 403 determination for abuse of discretion.[10] *Montgomery*, 810 S.W.2d at 391. In determining whether the trial court abused its discretion in making its Rule 403 determination, the appellate court must not only determine that the trial court did in fact conduct the required balancing test and did not simply rule arbitrarily or capriciously, but must also measure the trial court's ruling against the relevant criteria by which a Rule 403 decision is to be made. *Id*. at 392. Where this review leads to the conclusion that the danger of unfair prejudice

---

[10]As noted by the Texas Court of Criminal Appeals, "Rule 403's use of the word 'may' reflects the draftsman's intent that the trial judge be given very substantial discretion in 'balancing' the probative value on the one hand and the unfair prejudice on the other, and that he should not be reversed simply because an appellate court believes that it would have decided the matter differently." *Powell*, 189 S.W.3d at 288–89.

substantially outweighs the probative value of the evidence, the court should find that the trial court erred in failing to exclude the evidence. *Id*.

The first factor weighs in favor of admission of the text messages. The text messages implied that Sanders was a drug dealer and that he had marihuana with him while at the Park. Therefore, the evidence is relevant to Sanders' motive to evade detention or arrest when Sprague arrived at the Park. Sanders contends that the text messages did not make it any more probable that his motive to evade detention was "superior" to that of others at the Park; however, he fails to cite authority in support of such a standard and we are aware of none.

The second factor weighs in favor of admission of the text messages. There was other evidence before the jury that indicated Sanders was involved in drugs. In Sanders' statement to Detective Matt Cashatt, he admitted to smoking marihuana on the day in question. Police Officer Troy Daniels testified that in his opinion, Sanders was high on marihuana the night Sprague was killed, and he also testified that it could be smelled "in the air once you got out there." A crime scene technician and Detective Brad Thacker both smelled marihuana when they examined Sanders' vehicle the day after the murder. Further, although the trial court admitted the texts into evidence, at Sanders' urging, the court gave a contemporaneous instruction to the jury:

> You are instructed that if there is any testimony before you in the case regarding the defendant's having committed offenses other than the offenses alleged against him in the indictment in this case, you cannot consider said testimony for any purposes unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any, were committed, and, even then, you can only consider the same in determining the motive or intent of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment of this case and for no other purposes.

20

Therefore, we find that there was only a small likelihood that the text messages would improperly impress the jury in an irrational way.

After voir dire on Monday, the State's case-in-chief lasted from Tuesday through Friday and involved about two dozen witnesses. Sanders rested without calling a single witness. Sanders contends that this third factor weighs against admission because the fifth day of the trial "consisted exclusively of the State presenting testimony from two witnesses [Jeff Shaffer and Clay McClure] centering on the extraneous offense evidence" and because the State left them as the last witnesses before a weekend. The State argues that the time consumed by the primary witness, Shaffer, was "almost entirely attributed to [Sanders'] trial counsel." Shaffer and McClure testified for about seventy pages of the reporter's record; however, McClure's testimony was very short and much of the time involved in Shaffer's testimony was attributable to the arguments of counsel and times during which the witness was taken on voir dire. This factor is neutral.

The remaining factor (the proponent's need for the extraneous-offense evidence) weighs slightly in favor of admission. The text messages were admitted for the purpose of showing motive and intent. While motive is relevant, it is not a required element for the charged offense.

Based on the foregoing, we find that the factors weigh in favor of admitting the text messages for the purpose of showing the motive of the accused. Therefore, we overrule this point of error.

## V.     Did the Trial Court Err by Overruling Sanders' Motion to Suppress?

At trial, Sanders moved to suppress the evidence obtained from his cell phone, arguing that the telephone and the information within it were improperly seized without a valid warrant. After

21

a hearing, the trial court overruled Sanders' motion. Sanders renewed his objection at trial and was granted a running objection.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts that turn on credibility and demeanor while reviewing de novo other application-of-law-to-fact issues. *See Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). Appellate courts should also afford nearly total deference to trial court rulings on application-of-law-to-fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Appellate courts may review mixed questions of law and fact not falling within this category on a de novo basis. *Id.* We must affirm the decision if it is correct on any theory of law that finds support in the record. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

The Fourth Amendment provides individuals "[t]he right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV.

Here, we note that the evidence taken from the cell phone was obtained only after a search warrant had been obtained, after which an expert retrieved various text and email messages. There is no evidence that the expert used the cell phone's pass code in retrieving the data from the phone. There was only paltry information obtained from Sanders' cell phone after it was seized and before a search warrant was obtained. That information was limited to the make and identification

number of the cell phone itself; that information was used by the police to describe the telephone when they obtained a search warrant to glean the information contained within it. Antecedent to that search, however, the police obtained Sanders' cell phone, and it was only because the police had possession of it that they were able to describe the object of the search in the affidavit supporting the request for a search warrant.

Accordingly, in order to examine whether the content of the cell phone was properly permitted as evidence, we must first determine if Sander's cell phone was seized or whether it was voluntarily turned over to the police. If it was seized, we must determine if the initial seizure of Sanders' cell phone was proper. It is undisputed that the police did not obtain possession of the telephone through a validly issued search warrant. When an item has been seized or a search has been conducted without a warrant, such a seizure or search would be per se unreasonable unless the State proved that the search or seizure fell within one of the exceptions to the warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *see Amores v. State*, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991).

Voluntary consent to a seizure or a search is a well-established and "long approved" exception to the warrant requirement, and the State contends that Sanders turned over the cell phone to Texarkana Police Detective Billy Giddens voluntarily. *See Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *State v. Weaver*, 349 S.W.3d 521, 525–26 (Tex. Crim. App. 2011). Here, after conducting a suppression hearing, the trial court found that Sanders "voluntarily gave his cellular phone to Detective Giddens." However, the record does not support that finding. During the suppression hearing, Giddens was asked by Sanders, "[S]o you didn't ask him for it: You told him

23

to give it to you, correct?" Giddens responded, "Told him to give me the cell phone." Later, Giddens clarified that he considered the direction for Sanders to hand over the cell phone an order. Sanders complied with the officer's order.[11]

Second, the State contends that the phone was seized incident to a lawful arrest. *See Riley v. California*, 134 S.Ct. 2473, 2486 (2014) (search incident to lawful arrest is reasonable intrusion upon Fourth Amendment rights). The record and audio/video recorded interview establish that Giddens took possession of Sanders' cell phone more than half an hour before an arrest was effected. Giddens admitted that at the time Sanders handed over his cell phone, Sanders had not yet been arrested, but had been merely "detained." Cashatt testified that at the time Giddens seized the phone, "probable cause had not been established, . . . and [they] had not gotten a warrant to seize the phone." Therefore, the seizure of the cell phone did not occur incident to a lawful arrest because the arrest did not attend the seizure.

The State maintains that the lawfulness of the seizure of Sanders' cell phone is not a pertinent question, on the basis that "[A]ny and all property on [Sanders'] person would have been lawfully seized" at the time of his arrest. The rationale here is what is known as the "inevitable

_____

[11]Sanders also argues that in handing over his cell phone, he was merely acquiescing to authority, which is not sufficient to show consent. For that proposition, Sanders relies on the United States Supreme Court's decision in *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968), where the defendant's mother told the police to "go ahead" and search her house when one of four officers who appeared at her front door announced that he had a search warrant to search the house (even though he did not have a warrant). The Supreme Court held that a search cannot be justified as lawful on the basis of consent when that consent has "been given only after the official conducting the search has asserted that he possesses a warrant." *Id*. at 548. In so holding, the Supreme Court stated: "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." *Id*. at 550. This case is clearly distinguishable from *Bumper* and its progeny because, in *Bumper*, one of the four present officers asserted that they had legal authority to conduct the search and seizure, whereas, here, Giddens made no such claim of lawful authority.

discovery" rule. This argument fails because Article 38.23(a) of the Texas Code of Criminal Procedure specifically bars the introduction of "evidence obtained by an officer or other person in violation of" the State or Federal Constitution or the laws of either in a trial of any criminal case. TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005). The Texas Court of Criminal Appeals has specifically determined that the "'inevitable discovery' doctrine is inapplicable in Texas based on that doctrine's inconsistency with the plain language of the statutory exclusionary rule." *Wehrenberg v. State*, 416 S.W.3d 458, 471 (Tex. Crim. App. 2013) (citing *State v. Daugherty*, 931 S.W.2d 268, 269–73 (Tex. Crim. App. 1996); *Garcia v. State*, 829 S.W.2d 796, 798–800 (Tex. Crim. App. 1992)).

Third, the State argues that Sanders' phone was seized to prevent the destruction of evidence. The need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search. *Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011). This argument falls within the purview of what is usually called the "exigent circumstances" doctrine. However, "the mere possibility that evidence may be destroyed does not rise to a finding of exigent circumstances." *Turrubiate v. State*, 399 S.W.3d 147, 153 n.4 (citing *United States v. Menchaca–Castruita*, 587 F.3d 283, 295–96 (5th Cir. 2009)). In determining whether exigent circumstances exist, the court considers whether there is proof that the officer reasonably believed removal or destruction of evidence was imminent. *Id*.

Here, after Cashatt had left the interview room, Giddens said that he observed Sanders being "busy" on his cell phone. Giddens testified that he deduced that Sanders "might have been destroying evidence." The recording reveals that Giddens then entered the room and told Sanders,

25

"I need . . . your phone[]"[12] and that Sanders responded by handing over his cell phone. Giddens explained, "[W]hen we have people in the interview rooms, and they're sitting there texting stuff, and there's a chance they could clear stuff off their phones, we're going to take their phone from them." About half an hour into his interview (before Sanders turned the cell phone over to Giddens), Sanders received two calls and two text messages on his cell phone. Sanders neither viewed the messages nor answered the calls at that time. According to the time of day listed on the recorded interview, Cashatt left the interview room where Sanders was sitting at about 9:05 and it is clear from the recording that Sanders was indeed "busy" on his cell phone from about that time until about 9:08, when he put his phone down on the table. However, Giddens did not enter the room and obtain the cell phone until 10:04, almost an hour later. There is no evidence that Sanders was using his cell phone, let alone deleting information therefrom, in the intervening time. This contradicts the State's position that there is sufficient proof that Giddens reasonably believed that the seizure of the cell phone was prompted by a belief that removal or destruction of evidence was imminent. (However, the error in Giddens' reasoning here did not prevent Giddens from truly believing that he had the right to seize the cell phone, an impression which would possibly have been strengthened by Sanders' subsequent delivery of the phone's pass code.)

We must conclude that the initial seizure of the cell phone by the police did not fall within a recognized exception to the need for a warrant. However, after the warrantless seizure, Sanders consented to having his phone searched. Sanders contends that the illegal seizure of his phone

---

[12]The audio/video recording reveals that Giddens actually said, "I need both your phones," apparently then erroneously believing that Sanders had two cell phones on his person.

26

taints his subsequent consent to search the phone and renders the evidence found through the search fruit of the poisonous tree. The primary purpose of determining whether consent is tainted is to ensure that evidence that is the fruit of an unreasonable search or seizure by police is not admissible in court. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).[13] However, consent may be sufficiently attenuated from the taint of a prior illegal search or seizure to allow the admission of the evidence. *See Brick v. State*, 738 S.W.2d 676 (Tex. Crim. App. 1987). Before it can be determined whether evidence derived from a warrantless (but consensual) search following an illegal search or seizure, is admissible, the State must first prove, by clear and convincing evidence, that the consent was voluntarily rendered and that the taint otherwise inherent in the illegality had dissipated. *See id.* at 680–81 (taint of illegal arrest must be attenuated from voluntary consent before evidence discovered pursuant to consent is admissible). The *Brick* factors by which attenuation of the taint is measured are: (1) the proximity of the consent to the illegality; (2) whether the seizure was brought about by police observation of the particular object for which they sought consent to search; (3) whether the illegal seizure was the result of flagrant police misconduct; (4) whether the consent was volunteered rather than requested by the detaining officers; (5) whether the defendant was made fully aware of the fact she could decline to consent and thus prevent an immediate search; and (6) whether the police purpose underlying the illegality was to obtain the consent.

---

[13]When evidence results from illegal actions of police, the issue is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488.

Here, Giddens seized the phone about thirty minutes before he asked Sanders for his consent to search it. Consent given "soon after" the rise of the illegality weighs in favor of suppression. *State v. Bagby*, 119 S.W.3d 446, 453 (Tex. App.—Tyler 2003, no pet.). When the time between the illegality and the consent is only a few minutes, this weighs in favor of suppression. *See Stone v. State*, 279 S.W.3d 688 (Tex. App.—Amarillo 2006, no pet.); *Beaver v. State*, 106 S.W.3d 243, 250 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). However, in this case, about thirty minutes intervened between the time that Giddens obtained the cell phone from Sanders and the request he made for its pass code. The expiration of this time weighs slightly in favor of admission.

The seizure of Sanders' cell phone alone did nothing to allow the police to examine its contents. Even after being supplied with the pass code, Giddens testified that even though he "went through" the phone's text messages, he failed to find anything pertinent. Therefore, even though the police had possession of the cell phone, it did not provide any real fruit. The second factor weighs in favor of admission.

Here, Giddens testified that he believed that Sanders might be destroying evidence, and while we previously concluded that based on that belief, the seizure of the phone was not reasonable, it indicates that Giddens believed, albeit mistakenly, that he was justified in seizing the phone. *See Self v. State*, 709 S.W.2d 662, 667–68 (Tex. Crim. App. 1986) (conduct not in accord with state law does not necessarily rise to level of flagrant conduct); *see Stone*, 279 S.W.3d at 693–94. Even though Giddens' seizure of the phone was in violation of the Fourth Amendment, it was not shown to have been calculated by him to cause fear, surprise, or confusion, or to have

28

been done to see if "something might turn up." *Brown v. Illinois*, 422 U.S. 590, 605 (1975); *see Bagby*, 119 S.W.3d at 453 (citing *Renfro v. State*, 958 S.W.2d 880, 886 (Tex. App.—Texarkana 1997, pet. ref'd)). Therefore, the police misconduct in this case was not flagrant, and the third factor weighs in favor of admission.

The fourth factor regards whether the consent was volunteered or whether the consent came after a request from law enforcement. It is undisputed that Sanders only gave consent after that consent was requested by Giddens. This factor weighs in favor of suppression of the evidence.

Sanders was told of his *Miranda*[14] rights, both orally and in writing. Accordingly, he was made fully aware that he could terminate the interview at any time. Even though the *Miranda* warnings involve the right to terminate an interview, it would seem that they also would imply that Sanders did not need to subjugate himself to each demand by the police, including the right to refuse to consent. This appears to be a neutral factor.

The sixth factor considers the rationale or purpose of the police in performing the warrantless action. As discussed above, Giddens testified that he believed he was obtaining possession of the cell phone for the purpose of preventing the destruction of evidence, and the record does not indicate that his actions were calculated to obtain consent from Sanders. This factor weighs in favor of admission.

Having examined the *Brick* factors and viewing the record in the light most favorable to the trial court's ruling, we find that Sanders' consent was sufficiently attenuated from the illegal seizure to permit the admission of the evidence from his cell phone. *See Bagby*, 119 S.W.3d at

---

[14]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

454. Even though the trial court denied the motion to suppress on other grounds, we must affirm the trial court's ruling if it is correct on any theory of law supported by the record. *See Osbourn*, 92 S.W.3d at 538.

Having found Sanders' consent to the search was sufficiently attenuated from the illegal seizure, we overrule this point of error.

## VI. Did the Trial Court Err in Denying Sanders' Motion for Mistrial?

In his sixth point of error, Sanders contends that the trial court erred in denying his motion for a mistrial because the State engaged in prosecutorial misconduct by implying that Sanders had threatened a witness.

At a pretrial hearing, the State made the statement that "some of the State's witnesses are being threatened" and went on to add that one of the witnesses had been assaulted. It did put a boundary on its assertion of witness tampering by saying that although "there are people saying they are doing it on [Sanders'] behalf," the State had "received no information that these threats or assaults were done at the request of Mr. Sanders or his friends and family." During the trial, the State called Earnest Terrell Young, who testified that when Sprague arrived at the Park on the night of his death, he (Young) saw a silver SUV that looked like Sanders' vehicle jump a curb while attempting to exit the Park. Young stated that although he did not see the silver SUV strike Sprague, when the SUV jumped the curb, he "saw a flashlight go up in the air." He stated that the police officer was the only one Young saw who had a flashlight and that the silver SUV continued on its way out of the Park after the flashlight soared. On cross-examination, Sanders attacked Young's credibility and his motivation for testifying, indicating that Young had a very limited

30

view of the impact site, that several different lights (headlights, overhead lights, flashing lights) were in his face, that his testimony of when and why he left the Park did not match the recording of the 9-1-1 call he had made to report Sprague having been injured, and that at the time of trial, he was on "probation" for burglary after having been arrested for burglarizing a church.

On redirect examination, Young stated that he was testifying because he was under subpoena and that he understood he would be arrested when he arrived at the courthouse due to the outstanding warrant for his arrest. After this admission, the State began a question of Young: "[H]ave you, in fact, also been threatened because people knew you were --." At that juncture, the State's question was interrupted by Sanders' objection. The trial court sustained Sanders' objection and removed the jury from the courtroom. Then, with the jury outside the courtroom, the trial court conducted a short hearing regarding the propriety of the question. During the hearing, Sanders moved for a mistrial, arguing that because the State admittedly had no evidence of Sanders' involvement with the alleged threats, its proposed question was "so outrageous and so inflammatory" that its taint rendered it impossible for the jury to render a fair decision. The State responded that its question was meant to rebut Sanders' attempts to impeach Young's credibility and Sanders' attempt to question Young's motives in testifying. Although the trial court sustained Sanders' objection to the line of questioning, it denied his motion for mistrial.

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999). "'Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required.'" *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex.

31

Crim. App. 2004)). As stated above, in order to preserve error regarding prosecutorial misconduct or other improper evidence or remarks placed before the jury, three things are required: (1) a specific and timely objection, (2) a request for an instruction to disregard if the objection is sustained, and, (3) if the instruction is given, a motion for mistrial. *See Fuller*, 827 S.W.2d at 926; *see Penry*, 903 S.W.2d at 764.

Although Sanders' objection was sustained, he failed to request the intermediate remedy of providing an instruction for the jury to disregard the objectionable matter, moving directly to a request that the trial court grant a mistrial. By failing to request an instruction to disregard, the trial court was deprived of the ability to take that intermediate step. *See Penry v. State*, 691 S.W.2d 636, 649–50 (Tex. Crim. App. 1985); *Bryant v. State*, 25 S.W.3d 924, 926 (Tex. App.—Austin 2000, pet. ref'd). Mistrial is appropriate only when the objectionable event is so inflammatory or pervasive that a curative instruction is not likely to prevent the jury from being unfairly prejudiced against the defendant. *See Bauder v. State*, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996), *overruled on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007).

Sanders cited *Rogers v. State*, 725 S.W.2d 350 (Tex. App.—Houston [1st Dist.] 1987, no pet.), for the proposition that a request for an instruction to disregard is not necessary in order to preserve error. In *Rogers*, the court of appeals held that error was preserved and a mistrial was required due to the State's unobjected-to (albeit pervasive) misconduct which "could serve no purpose other than to inflame and prejudice the minds of the jurors." *Id.* at 358–61. In *Rogers*, while cross-examining the defendant and defense witnesses, the State made numerous side-bar comments regarding the witnesses and the evidence and suggested inflammatory facts that lacked

32

any evidentiary support in the record. In contrast with the situation in *Rogers*, the State's conduct here does not rise to the outrageous and pervasive levels seen in that case. *Id.* Therefore, the facts of *Rogers* are distinguishable from those we observe here.

Sanders also argues that the facts of this case are similar to those of *Anderson v. State*, 635 S.W.2d 722, 723 (Tex. Crim. App. 1982) (en banc). In *Anderson*, the State asked the complaining witness if he was scared and nervous to be in the courtroom, and he responded affirmatively. *Id.* The State then asked, "In fact, did your wife receive a threatening phone call?" *Id.* The defendant objected, and his motion for mistrial was granted. *Id.* The appeal resulted from a subsequent guilty plea by Anderson. However, *Anderson* is inapplicable to this case because it did not examine the merits of the granted mistrial; rather, the only role that the objectionable line of questioning bore to the case on appeal was that Anderson claimed that the State engineered the mistrial through improper questioning. Anderson, therefore, claimed that he had been subjected to double jeopardy. *Id.*

The isolated act of asking an improper question will rarely require a mistrial because, in most cases, any resulting harm can be cured by an instruction to disregard—an instruction which the jury is presumed to follow. *Ladd*, 3 S.W.3d at 567; *Sharper v. State*, 22 S.W.3d 557, 558–59 (Tex. App.—Texarkana 2000, no pet.). Here, the State's improper question was not so very inflammatory or its effect so pervasive that an instruction for the jury to disregard it would fail to cure any resulting harm. Accordingly, we find that Sanders failed to preserve this issue for our review. *See Fuller*, 827 S.W.2d at 926; *see Penry*, 903 S.W.2d at 764.

33

**VII.  Was There Sufficient Evidence to Support the Verdict?**

In his final point of error, Sanders contends that the evidence was insufficient to support his conviction.

In evaluating legal sufficiency of the evidence, we review all evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found guilt beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Brown v. State*, 333 S.W.3d 606, 608 (Tex. App.—Dallas 2009, no pet.).  We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

Sanders was charged under Section 19.02(b)(3) of the Texas Penal Code, which states that a person commits the offense of murder if he

> commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

34

TEX. PENAL CODE ANN. § 19.02(b)(3). The indictment alleged two alternative predicate felonies,

aggravated assault of a public servant and evading arrest or detention while using a motor vehicle.

The offense of aggravated assault of a public servant is defined as follows:

> (a)     A person commits an offense if the person commits assault as defined in § 22.01 and the person:

>> (1)     causes serious bodily injury to another, including the person's spouse; or

>> (2)     uses or exhibits a deadly weapon during the commission of the assault.

> (b)     An offense under this section is a felony of the second degree, except that the offense is a felony of the first degree if:

>> . . . .

>> (2)     regardless of whether the offense is committed under Subsection (a)(1) or (a)(2), the offense is committed:

>> . . . .

>>> (B)     against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty.

TEX. PENAL CODE ANN. § 22.02(a), (b)(2)(B) (West 2011).[15]  A person commits the offense of

evading arrest or detention if "he intentionally flees from a person he knows is a peace officer . . .

attempting lawfully to arrest or detain him."  TEX. PENAL CODE ANN. § 38.04(a) (West Supp.

2014). Evading arrest or detention is a felony if the actor uses a vehicle while the actor is in flight.

TEX. PENAL CODE ANN. § 38.04(b)(1)(B), (2)(A).  Here, although the dashboard camera (dash

---

[15]The actor is presumed to have known the person assaulted was a public servant or a security officer if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant or status as a security officer.  TEX. PENAL CODE ANN. § 22.02(c) (West 2011).

35

cam) audio/video recording from Sprague's patrol car did not show Sprague being struck by a vehicle, it did show only a few cars passing in front of the patrol car, one of them being a silver SUV which was apparently trying to exit the Park through the exit near Sprague's parked patrol car. A "BOLO" (Be On the Look Out for) message was transmitted to all officers of the Texarkana Police Department, alerting them to watch for the silver SUV. Although the video recording captured the image of several cars leaving the Park, it does not show Sprague trying to detain any of them. The reason that it does not show Sprague's attempts to detain automobiles is because he exited the range of the images recorded by the dash cam as he walked behind the patrol car into the parking lot. Although the video portion of the recording did not capture Sprague's image, the audio portion continued to record the occurrences around him because the audio was being transmitted from a microphone on Sprague's person. That audio portion of the recording revealed that Sprague yelled, "Hey, stop," but neither the video nor the audio recording indicate the identity of the person Sprague was directing his command to or the kind of car driven by that person. It is impossible to determine from the recording the identity of the person to whom Sprague's comment was directed.

John McGee testified that Sanders was present at the Park that night and that he was driving a silver SUV, but he did not believe Sanders ever got out of the vehicle. As McGee was leaving, he saw the SUV attempting to exit the parking lot. Although McGee said that he observed the SUV jump the curb and then saw the officer on the ground, he candidly admitted that he did not see the silver SUV strike Sprague. McGee testified that he stopped his vehicle and stayed with the injured Sprague while he and others called the 9-1-1 operator to report the injury. On cross-

examination, McGee admitted that at the time the officer was struck, he (McGee) was in the process of backing his car up when he saw the SUV jump the curb.

As discussed above, Sanders was interviewed at the Texarkana police station by Cashatt. Sanders admitted that he was at the Park that night and that he was the sole occupant and driver of a silver 2010 GMC Acadia (an SUV) that night. Although he saw Sprague arrive at the Park before the commotion began and saw Sprague activate the overhead lights on his patrol car, he denied hitting anything with his SUV as he drove out of the Park. Although Sanders initially maintained that he rolled through the Park and did not stop, he later changed his story somewhat to indicate that he did stop there to see his cousin. After the interview, Cashatt obtained a warrant for Sanders' arrest, charging him with responsibility for Sprague's death. At trial, Cashatt admitted that at an earlier writ hearing, he testified that whomever hit Sprague had not done so intentionally and that he believed it to have been an accident. At the time of the previous hearing, it was his opinion that Sanders had not seen Sprague when Sprague was run down.

Kechelle Dansby testified that she was at the Park at the time Sprague was run over by a car. Dansby testified that she saw Sprague get out of his patrol car and stand under the brightest part of the street light. She also saw a silver SUV back into a parking space before driving toward one of the Park exits, then jump the curb and bounce over that curb as Sprague was waiving his hands in a fruitless attempt to stop the SUV. Dansby testified that she then saw the silver SUV run over Sprague and saw his body go underneath it. Although she saw Sanders driving a silver SUV that night, she did not testify as to the identity of the vehicle's driver at the time it struck the officer. When she spoke with the police on the night in question, she falsely identified herself by

37

her sister's name because she had outstanding warrants for her arrest at the time. She did not reveal to the police what she had seen that night until after she had been arrested on an outstanding warrant.

Earnest Young was also present at the Park at the time of the events in question. He saw Sanders standing next to a silver SUV, but never saw him get into it or drive it. At trial, he testified that the car that struck Sprague "looked sorta like [the] one" Sanders had been standing near. He testified that he did see the SUV jump the curb, and he saw the officer's flashlight go up in the air, but he did not see which car actually struck Sprague. From what he saw, it did not appear to him that the SUV's driver saw the officer before the vehicle struck him.

Troy Daniels was also at the Park when Sprague was run over. He testified that he thought he saw Sanders sitting on the driver's side of a silver SUV before the police officer arrived at the Park and believed Sanders was high on marihuana at that time because you could smell it in the area. He said that although he saw the silver SUV drive toward the exit from the Park, the officer waved his flashlight at traffic, and then that SUV jumped the curb, but he did not see it drive towards the officer. He testified that he then believed that the SUV was about to get pulled over and, if so, that circumstance would allow the other cars to escape. After he saw the SUV jump the curb, he observed it hesitate before leaving the area, and it was at that time that Daniels saw the officer and his flashlight on the ground. He indicated that there were many cars attempting to leave the Park after Sprague arrived. Because he was trying to leave the Park himself, he wasn't "paying attention to details."

38

A silver GMC Acadia, owned by Sanders' mother, was searched and subjected to tests by the police. Officer Spencer Price testified that when he entered the vehicle, he smelled the faint odor of marihuana. After examining the SUV and removing its right front tire, Price placed a different tire on the vehicle so that the car could be released back to its owner. Tests revealed that although there were no scratches or dents on the car, the plastic brush guard of the vehicle had been pushed out about a quarter of an inch. Although a search was made by police investigators for them, none of Sprague's DNA, fingerprints, fluids, or personal effects were found on the car. A search warrant was obtained for the electronic "black box" from the SUV, but it contained no data indicating that the vehicle had been in an accident.

The medical examiner who autopsied Sprague opined that the cause of death was the injuries sustained by Sprague, those injuries being consistent with being struck by a vehicle. He further testified that the abrasions on Sprague's body were consistent with being dragged over either asphalt or a rocky surface and that the cause of death was blunt force injuries.

Crime Scene Investigator Price noted a reddish-brown mark and tears on the officer's duty shirt that he believed were transfers of dirt caused by a vehicle. There were small marks on the back of the officer's shirt that appeared to be caused from the uniform catching on a rocky surface or asphalt. Sprague's duty gear, including his badge, radio, radio clip, handcuffs, and his handgun were also damaged in a manner consistent with being dragged on a rough surface.

Officer Marc Sullivan, a crime scene technician, stated that he examined the undercarriage of Sander's mother's SUV and that it appeared some dirt had been removed on the passenger side of the car and the passenger side wheel well, though it could have been caused by something as

39

simple as a tire rub.  He also noticed that the bumper was pushed out about one quarter of an inch and retention clips were broken, but he indicated that there was no way to tell when the retention clips had been broken or what happened that caused them to break.  Due to the presence of water spotting, Sullivan deduced that the car appeared to have been wiped down; while there were a few marks on the tires, those marks did not come from anything worn by Sprague.  Shawna Yonts, another crime scene technician, testified that she saw a disturbance in the dust on the hood of the SUV and the presence of partial fingerprint impressions in the dust, but she acknowledged that there was no way of telling when the disturbance in the dust or the fingerprints occurred.

Given the state of chaos that apparently erupted when Sprague suddenly appeared on the scene at the Park that night and the scarcity of witnesses who would be sympathetic to the cause of law enforcement at that time and place and under the circumstances that were described, an absence of more credible eye witness evidence is somewhat understandable.  Even though physical evidence was minimal, Sanders' vehicle was largely undamaged, and key eyewitness testimony could be considered questionable, there is, nevertheless, sufficient evidence to support a rational jury's determination that all of the elements of the offense had been proven beyond a reasonable doubt.  "It is axiomatic that, in gauging the legal sufficiency of the evidence to support a particular criminal conviction, reviewing courts are obliged to view all of the evidence in the light most favorable to the jury's verdict, in deference to the jury's institutional prerogative to resolve all contested issues of fact and credibility."  *Delay v. State*, 443 S.W.3d 909, 912 (Tex. Crim. App. 2014).  Following this rule, we find that there was legally sufficient evidence from which the jury in this case, acting reasonably, could have found Sanders guilty of striking Sprague (who died as

40

a result of the injuries that were thus caused) with a vehicle in the course of evading arrest or detention in a vehicle.[16]  Accordingly, we overrule this point of error.

We affirm the trial court's judgment.


                                        Bailey C. Moseley
                                        Justice

Date Submitted:      June 3, 2015
Date Decided:        August 12, 2015

Do Not Publish

---

[16]The jury found Sanders guilty "as charged in the indictment" without specifying which of the two alternative predicate felonies under which they found him guilty.  Because we find the evidence was sufficient to support Sanders' conviction based upon felony evading arrest, we need not address whether the evidence was sufficient to support a possible conviction based upon aggravated assault of a public servant.

Print this page

# Case # PD-1171-15

## Case Information

| | |
|---|---|
| Location | Court Of Criminal Appeals |
| Date Filed | 10/12/2015 02:46:43 PM |
| Case Number | PD-1171-15 |
| Case Description | |
| Assigned to Judge | |
| Attorney | Gena Bunn |
| Firm Name | Holmes & Moore, P.L.L.C. |
| Filed By | Marcus Brim |
| Filer Type | Not Applicable |

## Fees

| | |
|---|---|
| Convenience Fee | $0.00 |
| Total Court Case Fees | $0.00 |
| Total Court Filing Fees | $0.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $0.00 |
| Total Provider Tax Fees | $0.00 |
| Grand Total | $0.00 |

## Payment

| | |
|---|---|
| Account Name | Marcus Brim |
| Transaction Amount | $0.00 |
| Transaction Response | |
| Transaction ID | 11984208 |
| Order # | 007334474-0 |

## Petition for Discretionary Review

| | |
|---|---|
| Filing Type | EFile |
| Filing Code | Petition for Discretionary Review |
| Filing Description | |
| Reference Number | |
| Comments | |
| Courtesy Copies | creese@holmesmoore.com, jrochelle@txkusa.org, information@spa.texas.gov |
| Status | Rejected |

## Fees

| | |
|---|---|
| Court Fee | $0.00 |
| Service Fee | $0.00 |

## Rejection Information

| Rejection Reason | Time | Rejection Comment |
|---|---|---|

| Other | 10/14/2015 04:44:17 PM | The petition for discretionary review does not contain a certification of compliance with T.R.A.P. 9.4(i)(3). You have ten days to tender a corrected petition for discretionary review. |
|-------|------------------------|---|

## Documents

| *Lead Document* | Sanders, justin -- PDR.pdf | [Original] |
|-----------------|----------------------------|------------|
| *Attachments* | Direct Appeal Opinion.pdf | [Original] |